**REVISED**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 96-40622

DSC COMMUNICATIONS CORPORATION; DSC TECHNOLOGIES CORPORATION,

Plaintiff-Appellants and Cross Appellees,

VERSUS

NEXT LEVEL COMMUNICATIONS; THOMAS R. EAMES; PETER W. KEELER,

Defendants-Appellees and Cross Appellants.

Appeal from the United States District Court
for the Eastern District of Texas

February 28, 1997

Before POLITZ, Chief Judge, SMITH and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

DSC Communications appeals the district court's refusal to aggregate damages awarded to it by a jury for diversion of corporate opportunity and misappropriation of trade secrets, as well as the district court's denial of attorneys' fees. Next Level Communications cross appeals on numerous grounds, alleging that DSC's claims fail, that certain evidence was improperly admitted at trial, and that damages were improperly awarded.

For the reasons assigned, we affirm in part and vacate and remand in part.

**Background**

DSC Communications designs and manufactures telecommunications equipment. Thomas Eames and Peter Keeler began working at DSC in 1990 after DSC acquired their original employer, Optilink Corporation. At both Optilink and DSC, Eames worked as an engineer designing new technology, while Keeler worked in marketing.

When DSC acquired Optilink, Eames and Keeler were both involved with the "Litespan 2000" product, a digital loop carrier that represented a significant advance in communications technology. The Litespan combines many individual analog telephone signals into one digital signal. The Litespan quickly became very profitable for DSC, and the company began to consider developing a more advanced version of the Litespan, known as a broadband access product, that delivers television and computer services in addition to telephone service.

Eames began working to develop a broadband access product in 1994, and identified two alternative designs for the product: hybrid fiber coax ("HFC") and switched digital video ("SDV"). HFC design uses a system similar to that of existing cable television, and broadcasts TV signals. SDV design instead makes private, "point to point" connections to each household on the system.

In the early stages of broadband access development, it appeared telephone companies preferred HFC design as a short term option, but favored SDV as a long term design choice. DSC claimed at trial it instructed Eames to focus on HFC as a short term solution, but to continue developing SDV technology.

By 1994, Eames and Keeler were considering leaving DSC and

2

forming their own company. In May 1994, while still employed at DSC, Eames drafted a document representing a business plan for a new company. This document proposed the development of an SDV architecture, and was marked with the name "Next Level Communications."

In early July, 1994, Eames and Keeler obtained $5 million in financing to start Next Level. On July 8, 1994, Eames and Keeler resigned from DSC. At least 6 other DSC employees followed Eames and Keeler to Next Level. Next Level focused its efforts on developing an SDV system.

By January 1995, Next Level was low on funds, and began to seek investors so it could continue its product development. Several companies discussed investing with Next Level, including DSC. Ultimately General Instrument ("GI"), a larger company who principally manufactures television delivery equipment, committed to invest $6.5 million in Next Level in return for a 10% interest in the company, plus an option to buy the remaining stock.

DSC filed this lawsuit in April, after GI first announced its investment in Next Level, when it reviewed the files saved on Eames' computer at DSC and found three pages of Next Level's May business proposal. In September 1995, GI exercised its option to purchase the remaining stock in Next Level and agreed to indemnify Eames and Keeler from any liability or expenses incurred by them in connection with this lawsuit.

After a three week trial, the jury found Eames, Keeler and Next Level liable for breach of contract, diversion of corporate

opportunity, and misappropriation of trade secrets. The jury also awarded DSC punitive damages. The total damages award against the defendants was $369,200,000.

DSC moved for entry of judgment for all actual and punitive damages, and asked the district court to grant a permanent injunction prohibiting Defendants from disclosing the trade secrets found to be misappropriated, plus requiring an assignment to DSC of any SDV patents. DSC also sought attorneys' fees, costs, and interest.

The district court declined to enter judgment as DSC requested. It held the legal theories underlying the three torts on which DSC recovered, breach of contract, diversion of corporate opportunity, and misappropriation of trade secrets, were duplicative, and refused to aggregate the damages. It ordered DSC to elect between the damages awarded for those torts. Under objection, DSC chose the damages for diversion of corporate opportunity, and the court entered judgment for $126,532,000. The court also entered judgment for DSC on the total $10,200,000 awarded in punitives, and granted DSC temporary injunctive relief until the judgment was satisfied that prevented Next Level from disclosing the technology at issue unless it did so in "the ordinary course of business." The court declined to award attorneys' fees.

Both parties appeal the judgment, DSC claiming it was wrongfully forced to elect its damages and Next Level arguing the evidence did not support verdicts of diversion of corporate

4

opportunity and misappropriation of trade secrets.

## Discussion

### I.

DSC first complains that the district court incorrectly ordered it to elect between relief for diversion of corporate opportunity and misappropriation of trade secrets.[1]  Since the district court found the three legal theories advanced by DSC at trial overlapped by alleging predicate facts that were nearly identical, it only allowed recovery under one of the theories.

DSC argues that the torts of diversion of corporate opportunity and misappropriation of trade secrets are distinct and do not overlap.  It contends, therefore, that it is entitled to relief for both torts.  Next Level responds that there is no need to consider the propriety of the election requirement because DSC's legal theories both fail: the corporate opportunity claim fails as a matter of law and was supported by insufficient evidence, while the verdict for misappropriation of trade secrets is insupportable as a matter of law, as well as a result of several evidentiary errors made by the district court.

We agree with Next Level that the award for usurpation of corporate opportunity cannot stand.  On October 28, 1996, this Court decided United Teachers Assoc. Ins. Co. v. MacKeen & Bailey, Inc., 99 F.3d 645 (5th Cir. 1996), which controls the

---

[1]DSC does not appeal the election order as to the breach of contract award.

5

determination. In that case, an insurance company sued its actuary for breach of fiduciary duty. We stated that while the actuary had fiduciary status, and had breached his duties to the insurance company, the district court erred in allowing recovery against him under the usurpation of corporate opportunity doctrine:

> We believe that under Texas law the usurpation of corporate opportunity doctrine does not apply to all corporate fiduciaries, but is limited to officers, directors, and major shareholders who are fiduciaries. While it is true that several Texas cases use the broader term "corporate fiduciary" in discussing the doctrine, we have found no Texas cases, nor has UTAIC cited us to any, applying the corporate opportunity doctrine to any person other than an officer, director, or major shareholder. We certainly have found no Texas cases standing for the proposition that this doctrine applies to all corporate fiduciaries.

Id. at 651 (footnote omitted). United Teachers had not been decided when briefs were filed or at the time of oral argument. Next Level filed a supplemental brief with this court after oral argument to call our attention to this clarification of existing case law and its application to the facts of this case.[2]

---

[2]Next Level did not originally argue to this Court that Eames and Keeler could not be liable as they were not officers, directors or major shareholders in their original brief. Next Level did, however, raise the argument that Eames and Keeler were only high level employees who did not occupy positions as officers, directors or major shareholders in the district court. It did not originally argue this theory on appeal as support for its allegation Next Level did not divert a corporate opportunity because the issue has not been definitively decided in Texas state court, and the only federal case law specifically addressing this issue was the district court holding in United Teachers overruled on appeal by this Court's holding.

While it is clear that a party who fails to raise an issue in its initial brief waives the right to review of that issue, Webb v. Investacorp, Inc., 89 F.3d 252, 257 n.2 (5th Cir. 1996), we have yet to address our procedure when a party wishes to file a supplemental brief on an issue because of an intervening change in law. Other circuits have held both that parties may raise new

In light of the holding in <u>United Teachers</u>, Eames, Keeler and Next Level were incorrectly found to be liable for diversion of corporate opportunity under Texas law. <u>United Teachers</u> clearly holds that, under Texas law, the usurpation of corporate opportunity doctrine is inapplicable to any fiduciary who is not also an officer, director, or major shareholder of a corporate entity. None of the appellees ever were, or ever alleged to be, officers, directors, or major shareholders in DSC. As a matter of law in this circuit, Eames, Keeler and Next Level could not be held responsible for diverting a corporate opportunity from DSC because they did not hold any of these positions. For this reason, the judgment in favor of DSC for diversion of corporate opportunity must be vacated.

Next Level also appealed the award to DSC of $20 million for conspiracy to usurp a corporate opportunity. Since it was legally

issues because of an intervening change in law, and that parties waived their right to have issues addressed by not discussing them in their original brief. <u>See</u> <u>United States v. Sterner</u>, 23 F.3d 250, 252 n.3 (9th Cir. 1994), <u>overruled on other grounds by</u> <u>United States v. Keys</u>, 95 F.3d 874 (9th Cir. 1996)(allowing issue to be raised for the first time in a 28(j) letter to prevent "substantial injustice"); <u>Louisiana-Pacific Corp. v. ASARCO, Inc.</u>, 24 F.3d 1565, 1582-83 (9th Cir. 1994), <u>cert. denied</u>, 115 S.Ct. 780 (1995) (allowing plaintiffs to file a supplemental brief after a statutory amendment); <u>contra</u> <u>Bickel v. Korean Air Lines</u>, 96 F.3d 151 (6th Cir. 1996), <u>cert. denied</u>, No. 96-796, 1996 WL 693653, (U.S. Jan. 21, 1997), (declining to consider an argument raised by the defendant in a supplemental brief even though a recent Supreme Court case dealt with some of the issues in the appeal).

Refusing to allow the introduction of the holding in <u>United Teachers</u> would result in this panel deciding an essential issue in this appeal under incorrect law. <u>United Teachers</u>' holding clearly states the law, and we are bound to follow our own precedent. We are unwilling to ignore this important clarification of the law, and perpetuate incorrect law, merely because <u>United Teachers</u> was decided after briefing and oral argument in this case.

impossible for the Appellees to usurp a corporate opportunity, they could not have conspired to do so. The damages award for conspiracy to usurp a corporate opportunity also fails.

Since we hold the verdict for diversion of corporate opportunity is incorrect as a matter of law, and the judgment awarding damages for that tort must be vacated, the verdict for misappropriation of trade secrets is no longer duplicative and may be reinstated if upheld. Next Level attacks this verdict on two grounds, first arguing that the misappropriation verdict was based on defective special interrogatories that did not adequately present the contested issues.

DSC alleged that Eames, Keeler, and Next Level misappropriated six trade secrets. Next Level mounted a double defense to this charge, arguing these trade secrets were not secret, then contending they had not misappropriated any of the alleged secrets. The trial judge submitted a single interrogatory to the jury asking if DSC proved Next Level had misappropriated DSC's trade secrets. Next Level claims this single interrogatory permitted a nonunanimous jury verdict, in that the jury did not specify which of the alleged trade secrets Next Level used.

We review the district court's use of special interrogatories only for abuse of discretion. E.E.O.C. v. Manville Sales Corp., 27 F.3d 1089, 1096 (5th Cir. 1994), cert. denied, 115 S.Ct. 1252 (1995). The district court has considerable leeway in deciding if special interrogatories should be used, as well as in constructing the form of the interrogatories. See Bryan v. Cargill, Inc., 723

8

F.2d 1202, 1204-6 (5th Cir. 1984).

Next Level argues that the damages model DSC presented depended on a finding six trade secrets were misappropriated. If the jury believed less than six secrets were wrongly used by Next Level, the damages model collapses. However, there is no indication that the jury found less than all six secrets were misappropriated, or that the evidence presented at trial was insufficient to support a finding of misappropriation on all six secrets. We do not find any abuse of discretion by the district court in its construction of the interrogatories.

Next Level also argues the misappropriation judgment must be overturned because the trial court erred in excluding important evidence. The trial court told the parties before trial it would not allow into evidence any documents that were not produced to opposing counsel in a timely manner. During trial, it refused to allow Next Level to cross examine the DSC expert with a short article written by George Hawley, a vice president at DSC, published in a trade journal in 1991. The article purportedly disclosed the elements of one of the six alleged trade secrets, contradicting the expert's testimony that the trade secret was not in the public domain. Next Level had not disclosed the article to DSC or listed the article on its pretrial exhibit list, claiming it was unaware of the article's existence because DSC withheld the article from them.[3]

---

[3]It is difficult to see how an article published in a trade journal could have been "withheld".

"The district court has broad discretion in deciding whether to admit into evidence exhibits not listed in the pre-trial order." Gilber v. Tulane Univ., 909 F.2d 124, 127 (5th Cir. 1990). As well, the district court has no obligation to consider evidence not listed in the pre-trial order unless "necessary to prevent manifest injustice." Goodman v. Lee, 78 F.3d 1007, 1011 (5th Cir. 1996), cert. denied, 117 S.Ct. 166 (1996). The district court made it clear evidence not disclosed to the opposing party would not be admitted at trial. The article may have been helpful to Next Level, but was not essential to its case. The trial court acted within its discretion.

For these reasons, we find there was no reversible error in the verdict for misappropriation of trade secrets. It therefore stands, and upon remand should be substituted for the judgment entered on usurpation of corporate opportunity.

## II.

DSC contends it is entitled to permanent injunctive relief[4] for misappropriation of trade secrets; either a limited injunction in combination with monetary damages or a total injunction prohibiting Next Level from using the trade secrets the jury found it misappropriated. DSC believes it should be allowed to choose between these forms of relief, after it sees what sort of permanent

---

[4]The district court issued a temporary injunction against Next Level directing that the trade secret technology may not be transferred or disclosed, but allows disclosure "in the ordinary course of business." The temporary injunction is only in place until the judgment for DSC is satisfied.

10

injunction the district court would fashion.

Since "the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies," Weinburger v. Romero-Barcelo, 102 S.Ct. 1798, 1803 (1982), it is clear injunctions are an extraordinary remedy, to be granted only when a party is threatened with injury for which he cannot obtain a sufficient legal remedy. Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2942 at 43-44 (1995).

We review the district court's denial of permanent injunctive relief for abuse of discretion. North Alamo Water Supply Corp. v. City of San Juan, Tex., 90 F.3d 910, 916 (5th Cir. 1996), cert. denied, 117 S.Ct. 586 (1996); Peaches Entertainment Corp. v. Entertainment Repertoire Assoc., 62 F.3d 690, 693 (5th Cir. 1995). "The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." Peaches Entertainment Corp., 62 F.3d at 693.

The district court did not abuse its discretion in deciding DSC was not entitled to permanent injunctive relief. It did not rely on clearly erroneous factual findings or an erroneous conclusion of law. The jury awarded DSC damages for lost sales on SDV products. DSC thus premised its damages claim on Next Level developing an SDV system that competed with DSC's system. As the district court noted, the money damages DSC recovered sufficiently

11

compensated it for that injury, and the drastic solution of a permanent injunction is unnecessary.  No irreparable harm was suffered.

### III.

Next Level contends the district court erred in reversing an earlier order and admitting, on the last day of testimony, evidence that GI had agreed to indemnify Next Level, Eames, and Keeler against any judgment for DSC.  The court originally ruled evidence of the indemnification agreement was inadmissible, but changed its ruling near the end of trial.  It rejected Next Level's argument that its agreement was equivalent to liability insurance, and was inadmissible under Fed.R.Evid. 411.  It stated that even had the agreement been insurance, it was admissible under the exceptions in Rule 411 to show Eames and Keeler's lack of ownership of the trade secrets.  It then noted that Next Level opened the door to admission of the agreement in voir dire, when its counsel told the jurors the case was "a question of life or death to Mr. Eames and Mr. Keeler."  Finally, it found that even if admission of the agreement was improper, the error was not sufficient to warrant a new trial.

We examine the admission of challenged evidence by asking two questions: did the district court abuse its discretion in admitting the evidence, and, if so, did its error affect the substantial rights of the affected party?  Munn v. Algee, 924 F.2d 568, 571 (5th Cir. 1991), cert. denied, 502 U.S. 900 (1991).  The district

12

court did not abuse its discretion in admitting evidence of the indemnity agreement. The agreement was an integral part of the relationship between the parties in this litigation. Evidence showed the price GI paid for Next Level was far below its actual worth. To explain this apparent incongruity, the jury needed to understand the parties' full relationship. It also cast doubt on counsel's characterization of the effect of the case on Eames and Keeler. While the timing of the district court's decision to allow this evidence was admittedly awkward, it was not an abuse of discretion.

## IV.

Next Level argues that the damage award for lost profits cannot stand because DSC's damage model was speculative: DSC has yet to sell its SDV product, and no market has been established for DSC's SDV system. It then attacks the methodology used by DSC's damage expert, Ray Sears, claiming the assumptions Sears relied on were based on conjecture not fact. Next Level's main objections to Sears' analysis are that Sears had no basis to assume a large number of households would gain access to SDV technology, and Sears assigned market shares to DSC and Next Level without solid evidence to support these numbers. Sears testified DSC would have assumed a forty percent market share in SDV sales had Next Level not been formed. With Next Level in the market, that company would acquire twenty percent of the SDV market, and later "take away" eight percent of DSC's market share. Finally, Next Level argues DSC did

13

not allocate any portion of the damage figure Sears proposed to specific acts by Next Level.  The jury, however, found that two of the acts included in the damages analysis were not wrongful.

Next Level also argues that as the damages award should be reversed, the punitives award should not be allowed to stand.

## A.  Were the damages speculative?

We examine the challenge that damages for lost profits are speculative to determine whether a reasonable person could find the profits were established with reasonable certainty, considering all evidence in the light most favorable to the plaintiffs.  Thompson and Wallace v. Falconwood Corp., 100 F.3d 429, 435 (5th Cir. 1996).

Under Texas law, "evidence to establish profits must not be uncertain or speculative."  Texas Instruments, Inc. v. Teletron Energy Management, Inc., 877 S.W.2d 276, 279 (Tex. 1994), (quoting Southwest Battery Corp. v. Owen, 131 Tex. 423, 426; 115 S.W.2d 1097, 1098 (Tex. 1938)).  However, the requirement that damages be based on more than speculation  "is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise."  Texas Instruments, 877 S.W.2d at 279.  "[I]t is not necessary that recovery for future profits should be established by exact calculation, as it is enough to have data from which these profits may be ascertained with a reasonable degree of certainty and exactness."  Fiberlok, Inc. v. LMS Enter., Inc., 976 F.2d 958, 962 (5th Cir. 1992) (citing Copenhaver v. Berryman, 602 S.W.2d 540, 544 (Tex.Civ.App. 1980)).

While SDV technology represents a new product the intensive

14

market research DSC presented at trial, coupled with the known history of the telecommunications industry and the success of the Lightspan product, established with sufficient certainty that SDV technology is likely to generate significant profits. Even if a product is not yet fully developed, a plaintiff is not prevented from recovering future lost profits if it was hindered in developing that product, and the evidence shows the eventual completion and success of that product is probable. As well, DSC has traditionally been a leader in producing technology used in telecommunications. Its history of strong performance is indicative of the likely success of this revolutionary new product.

**B. Was Sears' methodology based on conjecture?**

While "damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 24 (5th Cir. 1974), cert. dismissed, 419 U.S. 987 (1974) (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931). We do not agree that Sears' methodology was based on conjecture. The assumptions Sears made about the availability of SDV access and the respective market percentages of DSC and Next Level are adequately supported.

It is true these predictions are not guaranteed. No one can definitively say what the future holds for SDV technology, or DSC and Next Level in particular. However, uncertainty surrounding

precisely how the industry will evolve does not reduce all analysis about future developments to mere speculation.  Sears based his predictions on data obtained from respected sources in the telecommunications market.  The jury chose to believe his estimation of damages.  There was sufficient evidence presented to support the jury's verdict.

## C.  Was the unitary damages figure impermissible?

The damage model Sears presented showed the total damages allocated to Next Level's alleged wrongful conduct.  The jury then allocated damages to each different cause of action.  DSC was not obligated to precisely apportion damages for each instance of wrongful conduct it alleged, as unitary damages models are permissible under Texas law.  Bildon Farms, Inc. v Ward County Improvement Dist. No. 2, 415 S.W.2d 890, 896 (Tex. 1967).

The fact the jury found Eames and Keeler were not liable for soliciting key employees of DSC is irrelevant to our inquiry. First, the jury found Eames and Keeler were not liable for these acts in the context of the breach of contract claim.  Damages for breach of contract were not included in the judgment entered by the district court, and are not appealed to this Court.  Second, even if the jury's finding was relevant to the misappropriation of trade secrets damages, we may safely assume the jury did not award damages to DSC for conduct for which Eames and Keeler were not liable.

## D.  Should the punitive damages award be reversed?

Next Level argues that the punitive damage award must be

16

vacated since DSC's compensatory damage award cannot stand.  As we uphold the compensatory damage award, this argument fails.

V.

DSC appeals the district court's denial of attorneys' fees. It argues that attorneys' fees are recoverable incident to punitive damages, and that under our precedent, the district court erred in refusing to enter this award.

As DSC does not claim it is entitled to attorneys' fees because of a statute or contract, the court's authority to award fees is based on its inherent power to sanction behavior by a litigant.  Tacon Mechanical Contractors, Inc. v. Aetna Casualty & Sur. Co., 65 F.3d 486, 489 (5th Cir. 1995).  We review for abuse of discretion.  Id.

While we agree that attorneys' fees are allowed in connection with an award of punitive damages, an award of punitive damages does not automatically compel an award of attorneys' fees. Attorneys' fees not compelled by statute or contract are awarded at the discretion of the district court.  The district court issued a well-reasoned, thorough opinion detailing the reasons for its refusal of DSC's request for attorneys' fees.  We find no basis for reversing its holding.

DSC claims that Bauman v.  Centex Corp., 611 F.2d 1115 (5th Cir. 1980), is authority for the proposition DSC is entitled to its fees.  We agree with the district court that Bauman does not control.   In Bauman, the district court awarded attorneys' fees,

17

where the parties had stipulated beforehand the court would decide this matter instead of the jury. The parties also agreed on the amount of attorneys' fees that would be proper. Id. at 1121.

Contrary to DSC's apparent belief, Bauman does not direct that a court must award attorneys' fees in a particular case. It only upheld an award made by the district court. As well, the challenge in Bauman focused on the *amount* of the award, when the parties submitted no evidence of fees but had previously stipulated to a reasonable amount. We merely found the stipulation was sufficient to support the amount of the award.

### CONCLUSION

We reverse the award to DSC for usurpation of corporate opportunity and conspiracy to usurp a corporate opportunity. As the award for misappropriation of trade secrets stands, judgment on that claim should be entered. No other errors merit reversal or a new trial. DSC is not entitled to an award of attorneys' fees. We therefore AFFIRM IN PART, and VACATE IN PART and REMAND to the district court for entry of judgment consistent with this opinion.

18